UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

KUWAIT INVESTMENT OFFICE,

       Plaintiff,

       -v-                                    No.  11 CV 8403-LTS-DCF

AMERICAN INTERNATIONAL
GROUP, INC. et al.,

       Defendants.

------------------------------------------------------x

TEACHERS RETIREMENT SYSTEM OF THE
STATE OF ILLINOIS,

       Plaintiff,

       -v-                                    No.  13 CV 3377-LTS-DCF

AMERICAN INTERNATIONAL
GROUP INC. et al.,

       Defendants.

------------------------------------------------------x

GIC PRIVATE LIMITED

       Plaintiff,

       -v-                                    No.  13 CV 6565-LTS-DCF

AMERICAN INTERNATIONAL
GROUP INC.,

       Defendant.

-----------------------------------------------------------x

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA

       Plaintiff,

    -v-                        No.  14 CV 1270-LTS-DCF

AMERICAN INTERNATIONAL
GROUP INC. et al.,

       Defendants.

-----------------------------------------------------------x

LORD ABBETT AFFILIATED
FUND INC. et al.,

       Plaintiffs,

    -v-                        No.  15 CV 774-LTS-DCF

AMERICAN INTERNATIONAL
GROUP INC. et al.,

       Defendants.

-----------------------------------------------------------x

GENERAL ELECTRIC PENSION TRUST et al.,

       Plaintiffs,

    -v-                        No.  15 CV 957-LTS-DCF

AMERICAN INTERNATIONAL
GROUP INC.,

       Defendant.

-----------------------------------------------------------x

OPINION

APPEARANCES:

KIRBY MCINERNEY LLP
By: Ira M. Press, Esq.
    Meghan J. Summers, Esq.
825 Third Avenue
New York, New York 10022

*Attorneys for Plaintiff GIC Private Limited*

LIEFF CABRASER HEIMANN &
BERSTEIN LLP
By: Michael J. Miarmi, Esq.
    Steven E. Fineman, Esq.
    Daniel P. Chiplock, Esq.
    Nicholas Diamand, Esq.
    Douglas I. Cuthbertson, Esq.
250 Hudson Street, 8th Floor
New York, New York 10013-1413
    -and-
    Richard M. Hiemann, Esq.
    Joy A. Kruse, Esq.
    Bruce W. Leppla, Esq.
275 Battery Street, 29th Floor
San Francisco, California 94111-3339

*Attorneys for Plaintiff the Regents of the*
*University of California*

BOIES, SCHILLER & FLEXNER LLP
By: Jonathan D. Schiller, Esq.
575 Lexington Avenue, 7th Floor
New York, New York 10022

*Attorneys for Plaintiff Kuwait Investment Authority*

ROBBINS GELLER RUDMAN & DOWD LLP
By: Theodore J. Pintar, Esq.
    Darren J. Robbins, Esq.
    Thomas E. Egler, Esq.
    Susannah R. Conn, Esq.
655 West Broadway, Suite 1900
San Diego, California 92101
    -and-
    Samuel H. Rudman, Esq.
58 South Service Road, Suite 200

Melville, New York 11747

*Attorneys for Plaintiff Teachers Retirement*
*System of the State of Illinois*

ABRAHAM FRUCHTER & TWERSKY LLP
By: Michael M.Z. Twersky, Esq.
    Atara Hirsch, Esq.
One Penn Plaza, Suite 2805
New York, New York 10119
    -and
    Ian Berg, Esq.
    Takeo Kellar, Esq.
11622 El Camino Real, Suite 100
San Diego, California 92130

*Attorneys for Plaintiffs General Electric Pension Trust,*
*GE RSP U.S. Equity Fund, GE Institutional Funds,*
*GE Investment Funds, Inc., Elfun Trusts, Lord Abbett*
*Affiliated Funds, Inc., Lord Abbett Series Fund, Inc.-*
*Classic Stock Portfolio, Lord Abbett Research Fund, Inc.-*
*Lord Abbett Calibrated Dividend Growth Fund,*
*Lord Abbett Securities Trust-Lord Abbett Fundamental*
*Equity Fund, Lord Abbett Global Fund, Inc.-Lord Abbett*
*Multi-Asset Global Opportunity Fund, Lord Abbett Series*
*Fund, Inc.-Growth & Income Portfolio*

WEIL, GOTSHAL & MANGES LLP
By: Joseph S. Allerhand, Esq.
    Robert F. Carangelo, Esq.
    Stacy Nettleton, Esq.
767 Fifth Avenue
New York, New York 10153

*Attorney for Defendants American International*
*Group, Inc., David Herzog and Edmund Tse*

PAUL WEISS, RIFKIND, WHARTON &
GARRISON LLP
By: Richard A. Rosen, Esq.
    Brad S. Karp, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
    -and-
    Charles E. Davidow, Esq.
2001 K Street, NW

Washington, DC 20006-1047

*Attorneys for Underwriter Defendants*

AKIN GUMP STRAUSS HAUER & FELD LLP
By: Robert H. Pees, Esq.
    Jamison A. Diehl, Esq.
One Bryant Park
New York, New York 10036

*Attorneys for Defendant Martin J. Sullivan*

MAYER BROWN LLP
By: Richard A. Spehr, Esq.
    Joseph De Simone, Esq.
    Bradford Jealous, III, Esq.
1675 Broadway
New York, New York 10019

*Attorneys for Defendant Steven J. Bensinger*

GIBSON, DUNN & CRUTCHER LLP
By: Lee G. Dunst, Esq.
200 Park Avenue
New York, New York 10166-0193

*Attorneys for Defendant Joseph Cassano*

LATHAM & WATKINS LLP
By: Richard D. Owens, Esq.
    Paul A. Serritella, Esq.
885 Third Avenue
New York, New York 10022

*Attorneys for Defendant Andrew Forster*

MILBANK, TWEED, HADLEY &
MCCLOY LLP
By: Dorothy Heyl, Esq.
One Chase Manhattan Plaza
New York, New York 10005

*Attorneys for Defendant Alan Frost*

WILLKIE FARR & GALLAGHER LLP
By: Michael R. Young, Esq.
      Antonio Yanez Jr., Esq.
787 Seventh Avenue
New York, New York 10019-6099

*Attorneys for Defendant Robert Lewis*

SIMPSON THACHER & BARTLETT LLP
By: Paul C. Curnin, Esq.
      Michael J. Garvey, Esq.
      Craig S. Waldman, Esq.
425 Lexington Avenue
New York, New York 10017-3954

*Attorneys for Defendants Stephen F. Bollenbach,*
*Marshall A. Cohen, Martin S. Feldstein, Ellen V.*
*Futter, Stephen L. Hammerman, Richard C. Holbrooke,*
*Fred H. Langhammer, George L. Miles, Jr., Morris W.*
*Offit, James F. Orr III, Virginia M. Rometty, Michael*
*H. Sutton, Robert B. Willumstad, and Frank G. Zarb*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiffs in the above-captioned cases are investors who opted out of the class and settlement in In re American International Group, Inc. 2008 Securities Litigation, No. 08-CV-4772 (the "Class Action") and, at various times, filed individual actions for damages against the Defendants[1] (the "Individual Actions").[2]  The complaints filed in the Individual Actions ("Individual Complaints") substantially mirror the consolidated complaint filed in the Class Action, alleging that Defendants made a series of misstatements and omissions between March 16, 2006, and September 16, 2008 (the "Relevant Period") regarding AIG's exposure to risks in the market for sub-prime mortgages, which ultimately led to AIG's well-publicized bailout by the U.S. government in 2008.

Like the Class Action, the Individual Actions assert a combination of claims for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10-b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t-1; Section 11 of the Securities Act of 1933

---

[1]     Defendants in the Individual Actions, as in the Class Action, comprise American International Group, Inc. ("AIG" or the "Company"), various current or former AIG executives, directors ("Individual Defendants"), accountants and underwriters.  See In re American Int'l Grp, Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 517 (S.D.N.Y. 2010) ("AIG 2008 Sec. Litig.").  AIG is a holding company which, through its subsidiaries, engages in a wide range of insurance and financial services activities in the United States and abroad.  Id.  The remaining Defendants are identified in this Court's motion to dismiss opinion in the Class Action.  Id. at 518.  Not every Defendant is named in each Individual Action.

[2]     The pending Individual Actions are: Kuwait Investment Authority v. AIG, Inc. et al., No. 11-CV-8403 ("Kuwait"); Teachers Retirement System of the State of Illinois v. AIG, et al., No. 13-CV-3377 ("Illinois Teachers"); GIC Private Ltd. v. AIG, Inc., No. 13-CV-6565 ("GIC"); Regents of the University of California v. AIG, Inc., et al., No. 14-CV-1270 ("UC Regents"); General Electric Pension Trust, et al. v. AIG, Inc., et al., No. 15-CV-957 ("GE Pension"); Lord Abbett Affiliated Fund, Inc. et al. v. AIG, Inc. et al., No. 15-CV-0774 ("Lord Abbett").

("Securities Act"); Section 12(a)(2) of the Securities Act; Section 15 of the Securities Act; and various state common law causes of action for fraud and unjust enrichment.[3]  The Court has jurisdiction of these claims pursuant to 28 U.S.C. §§ 1331 and 1367.

Pending before the Court are several motions to dismiss claims asserted in the Individual Actions, including a joint omnibus motion to dismiss ("Omnibus Motion"),[4] which make various combinations of the following arguments:

(a) Plaintiffs' Securities Act claims are wholly barred by the three-year statute of repose established by Section 13 of the Securities Act;

(b) Plaintiffs' Exchange Act claims are wholly or partially barred by the five-year statute of repose established by 28 U.S.C. Section 1658(b);

(c) Plaintiffs' state common law claims are precluded by the Securities Litigation Uniform Reform Act ("SLUSA"); alternatively, such claims are not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b) or fail to state valid claims for relief on state law grounds;

(d) Individual defendants Joseph Cassano and Andrew Forster were not the

---

[3]  Not every type of claim is asserted in each Individual Action.

[4]  The pending motions are as follows: (1) Defendants' omnibus motion to dismiss in Kuwait, Illinois Teachers, GIC, and UC Regents; (2) Joseph Cassano and (3) Andrew Forster's separate motions to dismiss on statute of repose and not "maker" of misstatements grounds in Kuwait, Illinois Teachers and UC Regents; (4) Defendants' joint motion to dismiss on Securities Litigation Uniform Reform Act ("SLUSA") and failure to state a claim grounds in UC Regents, Dkt. No. 46; (5) AIG's motion to dismiss on SLUSA and state law grounds in GIC, Dkt. No. 22; (6) AIG's motion to dismiss on statute of repose grounds in GE Pension, Dkt. No. 19; (7) Defendants' joint motion to dismiss on statute of repose, SLUSA, and state law grounds in Lord Abbett, Dkt. No. 27; (8) Defendant Forster's motion to dismiss on statute of repose and not "maker" of misstatements grounds in Lord Abbett, Dkt. No. 33; and (9) Defendant Cassano's motion to dismiss on statute of repose and not "maker" of misstatements grounds in Lord Abbett, Dkt. No. 30.

"makers" of certain alleged misstatements, and claims against them based on statements issued by AIG or made by other individuals should be dismissed.

The Court has carefully considered all of the parties' submissions with respect to each of the motions.  Because there is substantial overlap in the arguments in support of and in opposition to the motions to dismiss, this Court will address them together in this omnibus opinion.  This opinion will be entered on the docket of each of the captioned cases and resolves all of the pending motions.  A separate order with reference to this opinion will be entered on each relevant docket, specifying the claims that are dismissed and, where necessary for clarity, those that survive.

I.

BACKGROUND

On September 16, 2008, the U.S. federal government announced an $85 billion bailout of AIG, and AIG's shares dropped 46 percent the following day.  On May 21, 2008, a class action complaint was filed against certain of the Defendants on behalf of investors who had purchased or otherwise acquired securities issued by AIG from May 11, 2007 to May 9, 2008.  Several other class action complaints followed and on March 20, 2009, this Court issued an order consolidating the AIG securities actions as In re American Securities Group, Inc. Securities Litigation, Master File No. 08 CV 4772 (LTS) (KNF), and appointing the lead plaintiff and co-lead counsel.  On May 19, 2009, the lead plaintiff in the Class Action filed a Consolidated Class Action Complaint ("CCAC") on behalf of a putative class of "all persons or entities (a) who purchased AIG common stock or other securities that traded on a U.S. public exchange during the Class Period [March 16, 2006, to September 16, 2008,] or (b) who purchased or acquired securities in or traceable to a public offering by AIG during the Class

Period, and who suffered damages as a result." (CCAC ¶ 72.) Plaintiffs in the Individual Actions, as alleged purchasers of AIG securities from March 16, 2006, to September 16, 2008, were members of the putative class in <u>AIG 2008 Sec. Litig.</u>

On October 7, 2014, this Court provisionally certified the class, for the purpose of settlement only, and entered an order preliminarily approving the proposed settlement. On March 20, 2015, the Court entered a judgment and order granting final approval of the settlement and certifying a settlement class consisting of all persons (a) who purchased AIG securities on an U.S. public exchange during the settlement class period or (b) who purchased or acquired AIG securities in or traceable to a public offering during the settlement class period. Plaintiffs in the instant actions chose to opt out of the class settlement, and filed individual suits for damages between November 18, 2011 and February 9, 2015. The following table identifies the date on which each of the Individual Actions was commenced:

| Case | Date Filed |
|------|-----------|
| <u>Kuwait</u> | November 18, 2011 |
| <u>Illinois Teachers</u> | May 17, 2013 |
| <u>UC Regents</u> | August 6, 2013 |
| <u>GIC</u> | September 16, 2013 |
| <u>Lord Abbett</u> | February 2, 2015 |
| <u>GE Pension</u> | February 9, 2015 |

As noted above, the complaints in the Individual Actions substantially mirror the allegations in the consolidated Class Action complaint; a brief summary is provided below for the purpose of the instant motions.[5]

---

[5]   The alleged facts are drawn from the Individual Complaints and/or the Plaintiffs' Omnibus Opposition to Defendants' Joint Omnibus Motion to Dismiss on

AIG is a holding company which, through its subsidiaries, engages in a range of insurance and financial services activities in the United States and abroad and is one of the world's foremost insurance and financial services organizations.  During the Relevant Period, Defendants allegedly made numerous misstatements in, and omissions from, SEC filings, press releases, earnings calls, and other public statements regarding the soundness of its credit default swaps ("CDS") portfolio and risks that the Company had assumed in the U.S. housing market.  These misrepresentations and omissions were allegedly designed to "conceal[] . . . either a significant decision taken by the Company to expose itself to risk or a significant weakness in the Company's risk controls that would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  <u>AIG 2008 Sec. Litig.</u>, 741 F. Supp. 2d at 531 (internal quotation marks and citation omitted).  Defendants allegedly assured investors and other market participants repeatedly about the soundness of AIG's CDS portfolio, the diligence and prudence with which AIG's subsidiary American International Group Financial Products Corp. ("AIGFP") managed risks in connection with investments tied to the U.S. housing market, and the Company's resulting ability to withstand even the most severe financial crisis.  The fraud was allegedly concentrated at AIGFP and AIG's securities lending business, AIG Investments.

Around 2004, AIG began writing CDSs on complex multi-sector collateralized debt obligations ("CDOs"), which often packaged together 100 or more securities, each backed by pools of mortgages, auto loans, or credit card receivables.  During 2005, AIG allegedly

---

Timeliness Grounds ("Pls. Omnibus Opp'n"), which cites to the Individual Complaints, and are taken to be true for purpose of this motion practice.  For a fuller factual discussion, see <u>AIG 2008 Sec. Litig.</u>, 741 F. Supp. 2d at 517-28.

ramped up its writing of CDSs and increasingly concentrated its portfolio on U.S. residential mortgage loans, but the Company's oversight of AIGFP and the CDS business diminished. Under the direction of AIG's CEO, Defendant Martin Sullivan, many risk controls were allegedly weakened or eliminated.

At the same time, AIGFP President Defendant Joseph Cassano allegedly ran AIGFP so as to insulate it from oversight.[6]  Cassano and his cabinet maintained control over the origination, valuation, and reporting functions relating to the CDS portfolio, and deliberately excluded from those functions key risk management and accounting personnel at AIGFP and its corporate parent AIG.[7]  Financial reporting decisions concerning the AIGFP CDS portfolio were made independently by Cassano and Andrew Forster, Executive Vice President of Assets and Trading & Credit Products at AIGFP, along with others, and the valuation process relating to the CDS portfolio was deliberately conducted outside the purview of the Company's risk management and financial and accounting oversight functions.[8]

Defendants' alleged fraud began on March 16, 2006, when AIG represented in its 2005 Form 10-K, with respect to CDS transactions, that AIGFP's payment obligations were remote, AIG's due diligence process in selecting the underlying assets to its CDSs was rigorous and the Company closely monitored their performance.  Defendants' alleged fraud continued in

---

[6]    See Kuwait Am. Compl. ¶¶ 24, 97, 122-34, 146; UC Regents Compl. ¶¶ 9, 18, 215; Lord Abbett Compl. ¶¶ 8, 18, 114.  See also Illinois Teachers Compl. ¶¶ 12, 151, 268.

[7]    See e.g., Kuwait Am. Compl. ¶¶ 24, 122-34, 452; UC Regents, ¶¶ 18, 215, 243, 317, 348; Lord Abbett Compl. ¶¶ 138, 219, 462-63.  See also Illinois Teachers Compl. ¶¶ 12, 151, 268.

[8]    See e.g., Kuwait Am. Compl. ¶¶ 25, 97; UC Regents Compl. ¶¶ 9, 243, 317, 348, 425; Lord Abbett Compl. ¶¶ 28, 236, 321, 447.

2007 when AIG represented in its 2006 Form 10-K that the prospect of AIGFP incurring any payment obligation from its CDS transactions was remote, even in severe recessionary market scenarios, and that AIGFP monitored the underlying portfolios diligently.  Plaintiffs allege that, in 2007, AIG, through press releases and its executives and officers, continued to understate the risk AIG faced and represent that the Company's approach to assessing investments tied to the housing market was cautious.  Defendants' alleged fraud continued in 2008, during which Defendants continued to conceal material information regarding AIG's CDS portfolio, even after the Company disclosed that its auditor PricewaterhouseCoopers ("PwC") had identified a material weakness in AIG's internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior CDS portfolio.  After posting record losses for the second quarter of 2008, Steven J. Bensinger, Executive Vice President and Chief Financial Officer of AIG from March 2005 until October 17, 2008, during an August 7, 2008 analyst call—six weeks before the bailout was announced—stated that AIG's capital position  "is sound" and "is stronger today than it was at the end of the first quarter."[9]  Plaintiffs allege that Defendants' fraud ended on September 16, 2008, when AIG issued a press release announcing the $85 billion government bailout of the Company.  The following day, AIG's share price dropped 46 percent, from $3.75 to $2.05.

       AIGFP became an operating subsidiary of AIG in 1993.[10]  Cassano was the CEO

---

[9]    See Kuwait Am. Compl. ¶ 369; UC Regents Compl. ¶ 582; Illinois Teachers Compl. ¶ 204; GIC Compl. ¶ 380.

[10]    Kuwait Am. Compl. ¶¶ 5-6; Illinois Teachers Compl. ¶ 69; UC Regents Compl. ¶ 5; Lord Abbett Compl. ¶ 4.

of AIGFP from January 2002 to March 2008.[11]  Cassano reported directly to William N. Dooley, a senior vice president at AIG.[12]  Forster was the Executive Vice President of Assets Trading & Credit Products at AIGFP, and reported to Cassano.[13]  Cassano headed AIGFP's CDS business, run by an internal group called the Assets/Credit Group; Cassano and Forster led the Asset/Credit Group operations based out of London.[14]  Cassano resigned from AIGFP effective February 29, 2008.[15]  After his resignation, Cassano continued to serve as a consultant to AIG through the end of 2008 and was paid $1 million per month for his services.[16]

With the exception of the complaint in Illinois Teachers, the Individual Complaints also allege that Cassano and Forster were part of a group of "Executive Defendants," who, by virtue of their executive positions and involvement in day to day operations, had the ability to influence decisions at AIG and/or AIGFP, including financial reporting and accounting functions.[17]  Cassano, moreover, is alleged to have personally exercised control over the

---

[11]     Kuwait Am. Compl. ¶ 44; Illinois Teachers Compl. ¶ 56; UC Regents Compl. ¶ 39; Lord Abbett Compl. ¶ 41.

[12]     Kuwait Am. Compl. ¶ 96; UC Regents Compl. ¶ 96; Lord Abbett Compl. ¶ 110.

[13]     Kuwait Am. Compl. ¶ 45; Illinois Teachers Compl ¶ 57; UC Regents Compl. ¶ 40; Lord Abbett Compl. ¶ 42.

[14]     Kuwait Am. Compl. ¶¶ 98, 451; UC Regents Compl. ¶¶ 98; Lord Abbett Compl. ¶ 112.

[15]     Kuwait Am. Compl. ¶ 44; Illinois Teachers Compl. ¶¶ 56, 339; UC Regents Compl. ¶ 39;  Lord Abbett Compl. ¶ 41.

[16]     Kuwait Am. Compl. ¶ 44; Illinois Teachers Compl. ¶¶ 56, 339; UC Regents Compl. ¶¶ 328, 470; Lord Abbett Compl. ¶ 41.

[17]     See Kuwait Am. Compl. ¶¶ 517-520; UC Regents Compl. ¶¶ 529, 531; Lord Abbett Compl. ¶¶ 531, 533; see also Illinois Teachers Compl. ¶¶ 60, 366.

Assets/Credit group and presided over weekly marketing and trading meetings.[18]  Forster is

alleged to have been within a small group of AIGFP personnel, which included Cassano, who

controlled the flow of information pertaining to the CDS portfolio.[19]  Cassano allegedly ran

AIGFP so as to insulate it from oversight.[20]  Cassano and his cabinet maintained control over the

origination, valuation, and reporting functions relating to the CDS portfolio, and deliberately

excluded those functions from scrutiny by key risk management and accounting personnel at

AIGFP and its corporate parent AIG.[21]  Financial reporting decisions concerning the AIGFP

CDS portfolio were made independently by Cassano and Forster, along with others, and the

valuation process relating to the CDS portfolio was deliberately conducted outside the purview

of Company risk management and financial and accounting oversight functions.[22]

   The complaint in Illinois Teachers alleges, in relevant part, that (1) Cassano

excluded an accountant tasked to identify material weaknesses in AIG's internal controls from

valuation of certain CDSs[23]; (2) Cassano and Forster, together with other "Officer Defendants"

of AIG and/or AIGFP, "because of their positions with the Company, possessed the power and

authority to control the contents of AIG's quarterly reports, press releases and presentations to

---

[18] See, e.g., Kuwait Am. Compl. ¶¶ 101, 445; UC Regents Compl. ¶¶ 95, 101, 453, 455; Lord Abbett Compl. ¶ 463.

[19] See Kuwait Am. Compl. ¶ 452; UC Regents Compl. ¶¶ 439, 460; Lord Abbett Compl. ¶ 468.

[20] See, e.g., Kuwait Am. Compl. ¶¶ 24-25, 97, 122-34, 146; UC Regents Compl. ¶¶ 18, 95, 97, 215, 439, 454; Lord Abbett Compl. ¶¶ 462, 465, 463.

[21] See, e.g., Kuwait Am. Compl. ¶¶ 24, 25, 97, 122-34, 146, 412; UC Regents Compl. ¶¶ 9, 18, 100, 146, 215, 317, 454; Lord Abbett Compl. ¶¶ 8, 18, 133-141, 462.

[22] See, e.g., Kuwait Am. Compl. ¶¶ 23, 97, 146; UC Regents Compl. ¶¶ 232, 243; Lord Abbett Compl. ¶¶ 8, 18, 219, 447.

[23] See, e.g., Illinois Teachers Compl. ¶¶ 12, 135, 219, 244, 268-93.

[the market] . . . and had the ability and opportunity to prevent their issuance or cause them to be corrected"[24]; and (3) the March 11, 2008, audit committee report noted "new material weakness resulted from the large errors in connection with the models used by AIGFP, the lack of timely elevation of key data on the negative basis and collateral issues to the AIG level, and the fact that AIGFP had designed a valuation process that did not allow the involvement of Enterprise Risk Management and the AIG Finance function in developing the approach."[25]

## II.

### DISCUSSION

In deciding a motion to dismiss, the Court assumes the truth of the well-pleaded factual allegations contained in the Individual Complaints.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The Court need not accept, however, legal conclusions, naked assertions, mere conclusory statements or implausible inferences.  See Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Twombly, 550 U.S. at 555).  A claim must raise more than the "mere possibility of misconduct"; a plaintiff instead must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678-79.  Because Plaintiffs' claims here sound in fraud, the heightened pleading standard of Rule 9(b) applies and Plaintiffs must "state with particularity the circumstances constituting fraud."  Id.

## A.  Timeliness of Plaintiffs' Federal Claims

Section 13 of the Securities Act provides that "[i]n no event shall . . . any action be brought to enforce a liability created under section 11 . . . more than three years after the

---

[24]      Illinois Teachers Compl. ¶ 60.

[25]      Id. ¶ 186.

security was bona fide offered to the public[.]" 15 U.S.C.S. §77m (LexisNexis 2012).  The

Exchange Act provides that "a private right of action that involves a claim of fraud, deceit,

manipulation, or contrivance in contravention of . . . the securities laws . . . may be brought not

later than the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5

years after such violation."  28 U.S.C.S. §1658(b) (LexisNexis 2014).

        Defendants, relying principally on the Second Circuit's decision in Police & Fire

Dep't Syst. of Detriot v. IndyMac MBS, Inc., 721 F.3d 95 (2d Cir. 2013) ("IndyMac"), contend

that all of the Securities Act claims asserted in the Individual Actions, and many of Plaintiffs'

Exchange Act claims, are barred by the relevant statutes of repose.  A district court may consider

timeliness arguments on a motion to dismiss when the circumstances are "sufficiently clear on

the face of the complaint and related documents as to make the time-bar ruling appropriate[.]"

LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 157 (2d Cir. 2003).  Defendants

contend that Plaintiffs' Securities Act claims are completely time-barred by the three-year statute

of repose set forth in Section 13 of the Securities Act because each of the Individual Complaints

asserting such claims was filed more than three years after the last of the AIG offerings at issue.

Defendants contend that Plaintiffs' Exchange Act claims are time-barred in whole or in part by

the five-year statute of repose set forth in 28 U.S.C. Section 1658(b)(2) based on the filing dates

of the Individual Complaints.  (See supra page 10.)  Plaintiffs argue, in opposition, that all of the

claims are timely because the statutes of repose were tolled by the timely filing of the Class

Action, or that the Class Action complaints effectively commenced the litigation of the claims

Plaintiffs now pursue.  Plaintiffs also argue that, to the extent the Exchange Act statute of repose

was running during the pendency of the Class Action and prior to the commencement of the

Individual Actions, the relevant "violation" date for computing the timeliness of their Exchange

Act claims is September 8, 2008, the date on which the alleged fraud ended, rather than the date of any particular allegedly fraudulent statement or publication.[26]

Statutes of repose are different from statutes of limitations. The Second Circuit explained in IndyMac:

Statutes of limitations limit the availability of remedies and, accordingly, may be subject to equitable considerations, such as tolling, or a discovery rule. In contrast, statutes of repose affect the underlying right, not just the remedy, and thus they run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could have not yet have, discovered that she has a cause of action.

IndyMac, 721 F.3d at 106 (quoting Fed. Hous. Fin. Agency v. UBS Americas Inc., 712 F.3d 136, 140 (2d Cir. 2013)) (internal citations and quotation marks omitted); see also CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2182 (2014) ("A statute of repose 'bars[s] any suit that is brought after a specified time since the defendant acted . . . , even if this period ends before the plaintiff has suffered a resulting injury.'" (citation omitted)).

At the center of the parties' respective arguments concerning the effect, if any, of the Class Action on the statutes of repose is disagreement over the applicability of the Supreme Court's decision in American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974), and the Second Circuit's decision in IndyMac. Defendants argue that IndyMac precludes the application of American Pipe to give the Individual Actions the benefit of the Class Action filing date for statute of repose purposes; Plaintiffs principally argue that IndyMac is inapplicable or distinguishable. The Court's analysis, accordingly, begins with a review of these two decisions

---

[26]  Two of the Plaintiffs, Lord Abbett and GE Pension, filed their complaints more than five years after September 16, 2008, and thus their Exchange Act claims would not be timely even if the statute of repose had not started running until after the fraud allegedly ended.

and their implications for the viability of Plaintiffs' claims under the federal securities laws.

### 1.  *American Pipe Tolling and IndyMac*

In <u>American Pipe</u>, the State of Utah brought a putative antitrust class action and the court, while finding most requisites of Federal Rule of Civil Procedure 23 satisfied, denied class certification on the grounds of failure to meet the numerosity requirement.  414 U.S. at 541.  Thereafter, the entities that would have been covered by Utah's proposed class definition moved to intervene in Utah's action.  <u>Id.</u>  The district court denied the motion and the Court of Appeals for the Ninth Circuit affirmed, finding that the motion was precluded by the relevant statute of limitations, which had expired after Utah's complaint was filed and before the motion to intervene was filed.  <u>Id.</u> at 543-44.  The Supreme Court reversed, holding that, "at least where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable,' the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."  <u>Id.</u> at 552-53.  Finding that a contrary rule would "breed needless duplication of [intervention] motion[s]," the Supreme Court concluded that the appropriate rule should be that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  <u>Id.</u> at 554.  The Court later expanded this rule in <u>Crown, Cork & Seal Co. v. Parker</u>, an employment discrimination action, holding that, until class certification is denied, "[t]he filing of a class action tolls the statute of limitations as to all asserted members of the class, not just intervenors."  462 U.S. 345, 350 (1983) (internal quotation marks and citation omitted).

In IndyMac, the lead plaintiff in a putative securities class action asserted certain claims related to securities it did not purchase on behalf of a putative class that included members who had purchased the securities.  721 F.3d at 102.  After the district court dismissed those claims for lack of standing, certain putative class members, who had not been named as parties in the lead plaintiff's complaint, moved to intervene to assert claims with respect to the securities in question that they had purchased during the class period.  Id. at 103.  Although the three-year statute of repose under Section 13 had run for those claims, the would-be interveners argued, inter alia, that the American Pipe rule applied to toll the running of the statute from the time the class action complaint had been filed.  Id. at 101.

The Second Circuit rejected the argument, specifically addressing the question of whether the American Pipe principle—treating the filing of a class action as an event tolling the running of a statute of limitations—can properly be applied to the statute of repose under Section 13 of the Securities Act.  First, the IndyMac Court recognized that a statute of limitations governs the period in which plaintiffs are permitted to pursue their cause of action and is subject to tolling on equitable grounds.  Id. at 106.  By contrast, the court found that a statute of repose "creates a substantive right in those protected to be free from liability after a legislatively-determined period of time," and is subject only to "legislatively-created exceptions" and not to equitable tolling.  Id.  Because the American Pipe Court had discussed both judicial equitable powers and Federal Rule of Civil Procedure 23 in reaching its holding that the filing of the class action tolled the statute of limitations, the Second Circuit addressed the question of whether Rule 23 creates a viable legislative exception to the statute of repose.  The IndyMac Court answered this question in the negative, holding that any extension of the statute of repose by virtue of the class action procedural vehicle under the Rule 23 would constitute the "abridge[ment],

enlarge[ment] or modif[ication] of a substantive right"—specifically, the right of defendants to be free from suit post the repose period—and would therefore be barred by the Rules Enabling Act, 28 U.S.C. § 2702(b).  Id. at 109.  Accordingly, the IndyMac Court reached the "straightforward" conclusion that "American Pipe's tolling rule, whether grounded in equitable authority or on Rule 23, does not extend to the statute of repose in Section 13" of the Securities Act.  Id.

   IndyMac's reasoning that the statutes of repose present an absolute bar against suit absent legislatively created exceptions is consistent with Supreme Court precedent concerning the nature and effect of statutes of repose.  In Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, the Supreme Court held that, because the purpose of the statute of repose under Section 13 is "clearly to serve as a cutoff," it is "inconsistent with tolling."  501 U.S. 350, 363 (1991); see also Waldburger, 134 S. Ct. at 2183 ("[A] statute of repose is a judgment that defendants should be free from liability after the legislatively determined period of time, beyond which liability will no longer exist and will not be tolled for any reason.") (citation and internal quotation marks omitted); Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 650 (2010) (noting that the statute of repose set forth by § 1658(b)(2) for violations of the Exchange Act is "an unqualified bar . . . giving defendants total repose after five years . . . .")

   Plaintiffs, nonetheless, contend that the statutes of repose do not bar any of their claims because: the IndyMac decision does not preclude American Pipe tolling under the circumstances of this case; IndyMac was wrongly decided; or they need not resort to tolling at all because their claims were actually asserted in a timely fashion by the Class Action.  Plaintiffs' arguments are unavailing.

   Plaintiffs' argument that IndyMac's rejection of American Pipe tolling is limited

to circumstances in which the original class action plaintiff lacked standing to pursue a claim asserted by a later intervener is inconsistent both with the clear language of the <u>IndyMac</u> opinion and with its rationale.  The <u>IndyMac</u> Court held, without caveat, that equitable tolling is inconsistent with statutes of repose, that the Section 13 statute of repose creates a substantive right, and that "permitting a plaintiff to <u>file a complaint or intervene</u> after the repose period . . . has run would . . . necessarily enlarge or modify a substantive right and violate the Rules Enabling Act."  721 F.3d at 109 (emphasis added).  The court made no distinction between complaints and intervention motions, and there is no suggestion in the opinion that a new complaint asserting a claim that the original class plaintiff had standing to bring would be any less violative of the statute of repose, which bars "any action" after the three-year period has run.  <u>See</u> 15 U.S.C.S. §77m (LexisNexis 2012).  <u>IndyMac</u>'s discussion of the significance of the lack of standing and the plaintiffs' effort to intervene was in the context of the <u>IndyMac</u> plaintiffs' alternative attempt to invoke the relation-back provisions of Federal Rule of Civil Procedure 15(c), an effort that was also unsuccessful.

Certain of the Plaintiffs argue that they are not invoking a tolling doctrine at all but, rather, relying on Rule 23 for the proposition that the filing of the Class Action serves as the operative date for the commencement of their Individual Actions.  Although there is some colorable basis for such an interpretation of the rule in <u>American Pipe</u>, neither that decision nor the Second Circuit's construction of the Rules Enabling Act permits Plaintiffs to evade the statute of repose in this fashion.  In <u>American Pipe</u>, the Supreme Court stated that, where a class action was certified, "the claimed members of the class stood as parties to the suit until and <u>unless they</u> received notice thereof and <u>chose not to continue</u>.  Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently

participate in the suit as well as for the named plaintiffs." 414 U.S. at 551 (emphasis added). It is notable that the <u>American Pipe</u> Court excluded opt-outs from the benefit of the lookback to the original class complaint, stating that the lookback applied "unless [claimed members of the class] . . . chose not to continue" to participate as such. <u>Id.</u> All of the Plaintiffs in the Individual Actions opted out of the Class Action prior to final certification of the settlement class. <u>See</u> <u>AIG 2008 Sec. Litig.</u>, 08-CV-4772, dkt. nos. 463, 518. Thus, where, as here, a plaintiff is not a member of a certified class, <u>American Pipe</u> holds that a tolling principle, rather than a lookback action commencement date, applies. 414 U.S. at 553. As previously explained, <u>IndyMac</u> precludes reliance on the tolling principle with respect to statutes of repose.

Plaintiffs also essay a constitutional argument, invoking <u>Wal-Mart, Inc. v. Dukes</u>, 131 S. Ct. 2541 (2001), and other decisions regarding meaningful notice of the opportunity to opt out, and contend that their due process rights would be violated if they opted out and could not then assert all claims that could have been asserted in the Class Action. The simple rejoinder to this argument is that no rule or statute, much less the Constitution, guarantees any plaintiff a right, unbounded by time and space, to assert a cause of action. Statutes of limitation and statutes of repose limit plaintiffs' options all the time, in individual actions and class actions. Rule 23 requires that members of a Rule 23(b)(3)-certified class be given the choice to opt out of the certified class rather than be bound by the resolution of the class action, but does not guarantee a plaintiff a viable individual cause of action.

Plaintiffs also assert that <u>IndyMac</u> was wrongly decided and that this Court should, like the Tenth Circuit in <u>Joseph v. Wiles</u>, hold that <u>American Pipe</u> tolling was legal in nature and thus not foreclosed by the <u>Lampf</u> rule that statutes of repose cannot be equitably tolled. <u>See</u> 223 F.3d 1155, 1166-67 (10th Cir. 2000). The Tenth Circuit reasoned, as other

courts in this district had done prior to IndyMac, that American Pipe tolling was available for

statutes of repose in light of the purposes behind Rule 23, which promotes judicial economy by

eliminating the need for potential class members to file individual claims.  Id. at 1167.

However, IndyMac is the controlling authority in this Circuit and requires the Court to reject

Plaintiffs' contrary lines of reasoning.

      *2.*     *Computation and Application of the Statute of Repose*

      Defendants argue that all of Plaintiffs' Securities Act claims are untimely because

all were commenced more than three years after the last relevant securities offerings.  Plaintiffs'

response focuses solely on the foregoing arguments regarding American Pipe and IndyMac.  As

to the Exchange Act claims, Plaintiffs further argue that, even if the statute of repose was

running during the pendency of the Class Action, Plaintiffs' Exchange Act claims should be

deemed timely to the extent their actions were commenced within five years (or, if greater, the

period provided under an applicable tolling agreement) of September 16, 2008, the date on

which the alleged fraud ended.  In this regard, Plaintiffs focus on Section 1658(b)'s use of the

term "violation" in identifying the point from which the statute of repose runs,[27] invoke the

principle that the alleged fraud scheme should be treated as a continuing violation, such that all

statements or omissions that constitute part of the alleged fraudulent scheme are actionable as

long as the statute of repose period encompasses the terminal date of the scheme.  Defendants

assert that the statute of repose runs from the date of each allegedly fraudulent misstatement or

omission, such that Plaintiffs' claims are untimely to the extent they are based on particular

---

[27]     The statute of repose applicable to the Exchange Act claims prohibits the
commencement of a private action involving a claim of fraud in contravention of a
regulatory requirement concerning the securities laws more than "5 years after such
violation."  28 U.S.C.S. § 1658(b) (LexisNexis 2014).

statements or omissions made outside of the statute of repose window.

a.   Application to Plaintiffs' Claims Under the Securities Act

Section 13 of the Securities Act provides that "[i]n no event shall . . . any action be brought to enforce a liability created under section 11 . . .  more than three years after the security was bona fide offered to the public[.]"  15 U.S.C.S. §77m (LexisNexis 2012).[28]  In the Second Circuit, the "bona fide" offering date of a registered security is the effective date of the registration statement through which it is offered.  See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 99 (2d Cir. 2004).  Defendants seek dismissal of all of Plaintiffs' Securities Act claims because they are barred by the three-year statute of repose set forth in Section 13 of the Securities Act.

The latest offering upon which Plaintiffs' Securities Act claims are premised was made pursuant to a registration statement that was effective when filed, on May 12, 2008.  The repose period therefore expired on May 12, 2011.  The only remaining Individual Complaint asserting Securities Act claims, that in Lord Abbett, was filed after May 12, 2011. (See supra page 10.)  Accordingly, all of the Individual Plaintiffs' claims pursuant to Sections 11 and 12 of the Securities Act must be dismissed as untimely.  Because Plaintiffs in Lord Abbett have failed to assert a timely primary violation of claims under Section 11, their claims made pursuant to Section 15 of the Securities Act also fail as a matter of law and must also be dismissed.  See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206-07 (2d Cir. 2009).

---

[28]    The three-year statute of repose likewise applies to bar any claims made pursuant to Section 12 of the Securities Act "more than three years after the sale."  Id.

b.  Application to Plaintiffs' Claims Under the Exchange Act

Plaintiffs' Exchange Act Claims are barred entirely or in part by the five-year statute of repose set forth in 28 U.S.C. Section 1658(b), which provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of . . . the securities laws . . . may be brought not later than the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation." Id. (Lexis Nexis 2014); see also Merck, 559 U.S. at 650 (noting that, for Section 10(b) claims, Congress instituted "an unqualified bar" in Section 1658(b)(2), "giving defendants total repose after five years").

Defendants assert, and Plaintiffs do not dispute, that the last of the alleged misrepresentations identified in any of the Individual Complaints is a statement made by Steven Bensinger, Executive Vice President and CFO of AIG at the time, during an August 7, 2008 analyst call.  (See Pls.' Omnibus Opp'n 10.)  Thus, because the statute of repose runs from the date of each relevant misstatement or omission, the Exchange Act claims asserted in GIC complaint must be dismissed in its entirety and the Exchange Act claims asserted in the remaining Individual Complaints must be dismissed to the extent the claims are based on misstatements or omissions made more than five years before the respective filing dates.[29]

While IndyMac squarely foreclosed tolling with respect to Section 13's statute of repose, there is some division among the courts in this Circuit as to whether the continuing violation doctrine applies in determining what constitutes a violation of Section 10(b) and Rule 10b-5 for purposes computing the statute of repose under Section 1658(b)(2).  Compare In re

---

[29]     Although the complaints in Lord Abbett and GE were filed more than five years after September 16, 2008, the defendants in each case had entered into tolling agreements.  See infra pages 28-29 n. 31, 32.

Beacon Assocs. Litig., 282 F.R.D. 315, 324-25 (S.D.N.Y. 2012) (statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter) with Marini v. Adamo, 995 F. Supp. 2d 155, 183 (E.D.N.Y. 2014) (continuing violations doctrine inapplicable to statutes of repose).  The Court is persuaded, especially in light of IndyMac's strict construction and application of the statute of repose, that application of the continuing violations doctrine to delay the commencement of the statute of repose in connection with independently actionable statements and omissions is inconsistent with the substantive right to repose after five years granted by Section 1658(b).  See Marini, 995 F. Supp. 2d at 182-84, and cases cited therein.

Plaintiffs' attempts to read the continuing violations doctrine into the applicable statutory language as a way to avoid Lampf and IndyMac are ungrounded.  Plaintiffs merely suggest that "violation," as used in Section 1658(b)(2), should be interpreted to encompass the series of misstatements and omissions made as part of a scheme.  This interpretation, however, is unsupported by the plain language of the statute.  Indeed, cases that have applied the continuing violations doctrine in the context of a statute of repose have not rested on interpretation of the language of Section 1658(b)(2).[30]  Plaintiffs' cases are thin on analysis altogether as to why the

---

[30]    The court in Kaplan v. S.A.C. Capital Advisors, L.P., 40 F. Supp. 3d 332, 342 (S.D.N.Y. 2014), applied the doctrine to a claim based on Section 20(A)(b)(10) of the Exchange Act, which provides that the total amount of damages cannot exceed the profit gained or loss avoided "in the transaction or transactions that are the subject of the violation." (emphasis in original).  Since the statute specifically provided that a series of transactions can form "the violation," the court held that the statute of repose did not begin to run until the last date on which the defendant traded based on the inside information.  The court declined to do so with respect to Section 10(b) claims in that insider trading case, however, because unlike Section 20A, which indicates that a violation can include multiple transactions, a violation of Section 10(b) and Rule 10b-5 occurs at each transaction for the purpose of calculating the repose date.  Id. at 343.  Thus, any claim under Section 10(b) and

doctrine should apply and none discusses the implications of IndyMac.  Since even one

misstatement can give rise to a "violation" for the purposes of the Exchange Act and, in turn, the

operation of Section 1658(b)(2), the expansion of "violation" to include a series of

misstatements and omissions would almost certainly require the operation of equitable

considerations—the kind foreclosed by the reasoning in IndyMac with respect to statutes of

repose.  See In re Bear Stearns Companies, Inc. Sec., Derivative & ERISA Litig., 995 F. Supp.

2d 291, 300 (S.D.N.Y. 2014) ("[T]he Second Circuit's reasoning in IndyMac was based on

general principles applicable to all statutes of repose.").  The continuing violations doctrine has

been recognized by courts as an equitable tolling doctrine.  See Paine Lumber Co. v. Neal, 244

U.S. 459, 477 (1917); Cohn v. New York City Dep't of Parks, Nos. 91 Civ. 6943, 91 Civ. 7979,

1996 WL 449539 (S.D.N.Y. 1996).

Thus, all Exchange Act claims based on misstatements and/or omissions prior to

the repose date listed in the chart below are dismissed as untimely under Section 1658(b)(2) in

each of the Individual Actions as follows:

| Case | Date Filed | Repose Date |
|------|-----------|-------------|
| Kuwait | November 18, 2011 | November 18, 2006 |
| Illinois Teachers | May 17, 2013 | May 17, 2008 |
| UC Regents | August 6, 2013 | August 6, 2008 |
| GIC | September 16, 2013 | September 16, 2008 |
| Lord Abbett | February 2, 2015 | February 8, 2008[31] |

Rule 10b-5 relating to a sale or purchase of securities that occurred outside the five-year statute of repose is time-barred.

[31]   The Lord Abbett Plaintiffs entered into a tolling agreement with AIG effective January 10, 2013, which ended on January 4, 2015.  Because twenty-nine days

| GE Pension | February 9, 2015 | May 26, 2007[32] |

Because Plaintiff GIC's complaint was filed more than five years after the last alleged misstatement, its Exchange Act claims are dismissed in their entirety.  Any corresponding Section 20(a) claims under the Exchange Act are also dismissed for lack of a primary violation.[33]  See ECA, 553 F. 3d at 206-07.

B.    Motions of Defendants Cassano and Forster to Dismiss Federal Claims Against Them

Individual defendants Joseph Cassano and Andrew Forster move separately to dismiss the Individual Complaints as against them, arguing that Plaintiffs' federal claims are untimely in whole or in part and that, under the principles enunciated by the Supreme Court in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), Plaintiffs have not pleaded sufficient claims against them to the extent Plaintiffs' claims are based on statements made by AIG or other individuals.  Plaintiffs contend that the claims are timely and that they have pleaded sufficient facts to state causes of action against these Defendants based not only on their own statements but also on those of AIG.[34]

---

passed between the end of the tolling agreement and the filing of the complaint in Lord Abbett, the relevant repose date is February 8, 2008.

[32]    The GE Pension Plaintiffs entered into a tolling agreement with AIG effective March 19, 2012, which ended on March 19, 2014.  The parties entered into another tolling agreement effective April 1, 2014, which ended on December 15, 2014.  Because a total of fifty-five days passed between the tolling agreements and the filing of the GE Pension complaint, the relevant repose date is May 26, 2007.

[33]    Plaintiffs are not precluded from using the time-barred misstatements and/or omissions as evidentiary support for any timely claims.

[34]    Plaintiffs do not dispute that their claims against Cassano and Forster based on oral statements by other individuals should be dismissed.  (See Pls' Ominibus Memo. of Law in Opp. to Def. Joseph Cassano's Mot. to Dismiss 12 n. 47.)

As explained above, Defendants' statute of repose arguments are well taken; Plaintiffs' complaints are dismissed against all Defendants to the extent their federal claims are untimely.  The Court, accordingly, addresses Defendants' argument that Cassano and Forster cannot be held liable for any timely claims that are based on statements that they did not make directly.  For the reasons that follow, the remaining timely federal claims asserted against Forster and Cassano in the Individual Complaints will be dismissed in part.

Cassano and Forster principally argue that they are officers of AIG's subsidiary, AIGFP, and that the Individual Complaints fail to state claims against them based on statements issued by AIG because they do not allege facts indicating that Cassano and Forster had ultimate authority over the content of AIG's allegedly fraudulent financial and corporate statements. Cassano and Forster point to Janus Capital, in which the Supreme Court, upholding the dismissal of a complaint, held that a limited liability company that was the adviser and administrator of a separately-owned and established mutual investment fund could not be held primarily liable for alleged misstatements and omissions in the disclosures issued by the fund.  In so doing, the Court stated that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.

Id. at 2302.  The Janus Capital Court found that such a narrow construction of "maker" for Rule 10b-5 purposes was required by its early rejection of aider and abetting liability in private lawsuits alleging violations of that rule in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994):

> A broader reading of 'make,' including persons or entities without ultimate control

over the content of a statement, would substantially undermine <u>Central Bank</u>.  If persons or entities without control over the content of a statement could be considered primary violators who 'made' the statement, then aidors and abettors would be almost nonexistent.

<u>Janus Capital</u>, 131 S. Ct. at 2302.

While not disputing that they would ultimately have to demonstrate that Cassano and Forster played controlling roles in any AIG statements for which Plaintiffs seek to hold them liable, Plaintiffs invoke the group pleading doctrine to defend the sufficiency of the Individual Complaints in this regard.

The group pleading doctrine "permit[s] plaintiffs, for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  <u>In re BISYS Sec. Litig.</u>, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005).   The doctrine is "extremely limited in scope."  <u>City of Pontiac Gen. Employees Ret. Syst. v. Lockheed Martin Corp.</u>, 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (citation omitted).  As stated above, the Supreme Court in <u>Janus Capital</u> held that a mutual fund investment adviser cannot be held liable for false statements included in its client mutual funds' prospectuses because it was not the "maker" of those statements.  131 S.Ct. at 2302.

Both the group pleading doctrine and <u>Janus Capital</u> require scrutiny of the level of control a particular defendant had over the entity making the statements.  Plaintiffs argue that their complaints are sufficient in this regard because both Cassano and Forster were in charge of the AIG subsidiary that was at the center of the alleged misconduct.  However, while the Individual Complaints allege plausibly that Cassano and Forster had control over the business

activities of AIGFP and the degree to which information regarding AIGFP was accessible to scrutiny by AIG, their allegations regarding control over statements issued in the name of AIG are conclusory at best.  Further undermining any reasonable inference that Cassano and Forster actually exercised control over AIG's determinations as to what to say and how to say it is Plaintiffs' practice of lumping the two AIGFP officers together with AIG executives in a group of "Executive" or "Officer" Defendants who allegedly controlled AIG's statements and information flow.

The group pleading doctrine derives from the notion that those in control of a particular entity are likely to control its speech.  See In re BYSIS, 397 F. Supp. 2d at 438.  Janus Capital requires mindful attention to the identity of the speaking entity and the relationship to it of those accused of responsibility for its statements: "[o]ne who prepares or publishes a statement on behalf of another is not its maker. . . . [and] attribution within a statement . . . is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  131 S. Ct. at 2202.  The statements in question here were issued by, and attributed to, AIG rather than AIGFP. Where, as here, the defendants have no role in the business structure of the speaking entity and are instead officers of a separate entity, and there is no allegation that corporate formalities have not been observed, generalized allegations that the defendants had as much authority over the speaking entity's statements as its own officers are insufficient to state plausibly a claim that the separate entity's officers "made" the speaker's statements.  Similarly, denial of information to an entity is not the same as deciding what the entity will say regarding the particular subject matter. Allegations that defendants concealed information regarding AIGFP's business from AIG are thus insufficient to identify Cassano and Forster as "makers" of AIG's statements about that business.  Cf. Janus Capital, 131 S. Ct. at 2302-03 (discussing rejection in Stoneridge Inv.

Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S.148 (2008), of Section 10(b) claim against third

party entities that agreed to arrangements that allowed a company to issue misleading statements

to investors, and adopting rule that "the maker of a statement is the entity with authority over the

content of the statement and whether and how to communicate it.  Without such authority, it is

not 'necessary or inevitable' that any falsehood will be contained in the statement.").

   Accordingly, the dismissal motions of Cassano and Forster are granted to the

extent that they are directed to Plaintiffs' Exchange Act claims based on statements issued by

AIG, for failure to state plausibly a claim that Cassano and Forster were "makers" within the

meaning of Section 10(b) and Rule 10b-5 of any allegedly fraudulent statements issued by AIG.

C. Impact of SLUSA on State Common Law Claims

   Defendants seek dismissal of the state common law claims asserted in the GIC,

UC Regents, and Lord Abbett actions as precluded by the Securities Litigation Uniform

Standards Act of 1998, 15 U.S.C. §§ 77p and 78bb ("SLUSA").  SLUSA provides in pertinent

part:

> No covered class action based upon the statutory or common law of any State or
> subdivision thereof may be maintained in any State or Federal court by any private
> party alleging - (1) an untrue statement or omission of a material fact in connection
> with the purchase or sale of a covered security; or (2) that the defendant used or
> employed any manipulative or deceptive device or contrivance in connection with
> the purchase or sale of a covered security.

15 U.S.C.S §77p(b)(1) (LexisNexis 2012); see also 15 U.S.C.S. §78bb(f)(1) (LexisNexis 2008).

SLUSA thus precludes state-law claims asserted in: (1) a "covered class action;" (2) based on state

law; (3) in which the plaintiff alleges either a "misrepresentation or omission of a material fact" or

"any manipulative or deceptive device or contrivance;" (4) "in connection with the purchase or sale

of a covered security."  See id.; Dacey v. Morgan Stanley Dean Witter & Co., 263 F. Supp. 2d 706,

709 (S.D.N.Y. 2003). A "covered class action" is defined as "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—(I) damages are sought on behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 15 U.S.C.S. § 77p(f)(2)(A)(ii) (LexisNexis 2012).

      Plaintiffs argue that the Individual Actions are not "covered class action[s]" within the meaning of SLUSA. For the reasons that follow, the Court finds that SLUSA applies to Plaintiffs' state common law claims, and Defendants' motions to dismiss Plaintiffs' state common law claims are granted.

      SLUSA was adopted by Congress in 1988 with the purpose of precluding plaintiffs from bringing state-law claims in order to circumvent heightened federal pleading standards for securities actions. See In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., No. 12 Civ. 5210, 2013 WL 6504801, at *4 (S.D.N.Y. Dec. 11, 2013). "SLUSA makes federal courts the exclusive venue of, and federal law the exclusive source of remedy for, certain class actions alleging securities claims." Lander v. Hartford Life & Annuity Ins. Co., 251 F. 3d 101, 108 (2d Cir. 2001). Courts have recognized that Congress intended the clause "for any purpose," as used in the definition of "covered class action," to be broadly construed, see In re Refco Inc. Sec. Litig., 859 F. Supp. 2d 644, 649 (S.D.N.Y. 2012), and that actions "need not have been formally joined or consolidated with other actions to trigger SLUSA, so long as they proceed as a single action for any purpose," In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 479 (S.D.N.Y. 2012) (citations and internal quotation marks omitted) (emphasis in original).

      The only issue disputed here is whether the instant opt-out lawsuits constitute a

"covered class action" under the meaning of SLUSA.[35]  The Individual Actions indisputably share

common questions of law and fact and rely on allegations that are virtually identical to those in the

Class Action complaint.  In addition, Individual Actions are currently subject to case

management orders tied to the Class Action, providing that (i) the Individual Actions were stayed

pending resolution of class certification and/or preliminary approval of settlement in the Class

Action; (ii) Defendants are restricted from moving to dismiss on the grounds that were already

asserted and rejected by the Court in the Class Action; and (iii) Defendants voluntarily agree to

provide Plaintiffs with discovery material already produced in the Class Action and the parties

agreed to be bound by all discovery orders and protocols in the Class Actions.[36]  Furthermore, the

briefing and litigation of the instant motions to dismiss the Individual Complaints has been highly

coordinated, with consolidated and interrelated briefing that frequently drew upon decisions and

litigation events in the Class Action.  Plaintiffs have all opted out of the Class Action and also, as

---

[35]     It is undisputed that the Individual Actions and the Class Action seeks relief on behalf of more than 50 persons and that AIG stock is a "covered security."  With the exception of a frail attempt by the plaintiff in UC Regents to demonstrate that an unjust enrichment claim seeking the recovery of stock drop damages occasioned by misrepresentations for which individuals and AIG received allegedly excessive compensation is not a fraud claim, Plaintiffs also do not dispute that they have made state law claims that have alleged misrepresentations and omissions of material facts in connection with the purchase or sale of a covered security.  Indeed, Plaintiffs' state law causes of action expressly incorporate the allegations underlying their federal securities fraud causes of action, which all rest on the alleged misrepresentations Defendants made with respect to AIG's subprime mortgage risk exposure.

[36]     Kuwait and Illinois Teachers are subject to Case Management Order No. 1, dated January 30, 2013, as amended by the memo-endorsed letter of Robert F. Carangelo, dated May 30, 2013 ("CMO No. 1").  GIC is subject to two separate case management orders, both dated November 25, 2015, which are substantially similar to CMO No. 1.  On November 21, 2014, Magistrate Freeman entered Omnibus Case Management Order No. 2 ("CMO No. 2"), which governs all above actions and UC Regents.  Lord Abbett is subject to a stipulation and consent order (Dkt. No. 35), which referenced CMO No. 2 and similarly precluded Defendants to move to dismiss on basis previously rejected in the Class Action.

discussed above, claimed the benefit of the Class Action in their attempts to oppose the motions to dismiss certain of their claims as untimely.  Despite these multiple points of coordination and interrelationship with the Class Action and among the Individual Actions, Plaintiffs argue that their respective Individual Actions are not a "covered class action" because they have not been formally consolidated or joined with the Class Action and are not a part of a multi-district litigation. Plaintiffs cite Ventura v. AT&T Corp. for the proposition that, because each Individual Action is on a "separate procedural track" from the Class Action, they should not be considered a "covered class action[s]" under SLUSA.  No. 05 Civ. 05718, 2006 WL 2627979, at *1 (S.D.N.Y. Sept. 13, 2006).

In Ventura, the court held that the plaintiff's state law claims were not precluded by SLUSA because the lawsuit was not a "covered class action."  2006 WL 262979, at *1.  In so holding, the court stated that the action was not joined or consolidated with the relevant class action and that the case had been on "a separate procedural track."  Id.  As other courts have pointed out, however, Ventura, offered little explanation or analysis and thus is of limited persuasive value.  See Amorosa v. Ernst & Young LLP, 682 F. Supp. 2d 351, 374-75 (S.D.N.Y. 2010).  SLUSA's plain language that a "covered class action" includes those that "proceed as a single action for any purpose," along with the weight of the authority on the issue, persuades the Court that Plaintiffs' claims are precluded.  SLUSA sweeps broadly and applies to individual cases that are "coordinated or consolidated" for pre-trial purposes with a class action.  See Fannie Mae, 891 F. Supp. 2d at 480 n.15 ("[A]ctions that are 'coordinated with the [related] class action' can be treated as part of the 'covered class action' for SLUSA purposes."); Amorosa, 682 F. Supp. 2d at 372, 377; Gordon Partners v. Blumental, 2007 WL 431864, at *18 (S.D.N.Y. Feb. 9, 2007).  Under these circumstances, SLUSA precludes Plaintiffs' attempt to engage in further litigation of their securities fraud claims under state law standards.  Plaintiffs here assert the same factual and federal legal

claims raised in the Class Action, and have received the benefits of coordinating discovery and other litigation activity with the Class Action.  Cf. In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 672 (S.D.N.Y. 2007) ("[P]laintiffs cannot reap the considerable benefits flowing from the joint prosecution of their claims, yet "through artful pleading . . . avoid the clear precepts of SLUSA and its preemption of state law securities claims for damages.") (internal quotation marks and citation omitted).  Plaintiffs' state common law claims are hereby dismissed.  In light of this determination, the Court will not address the parties' remaining arguments concerning the state law claims.

III.

CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss in part are granted.  The Clerk of the Court is directed to enter this Opinion on the docket of each of the above-captioned cases.  Separate orders with reference to this Opinion will be entered on each relevant docket, specifying the dismissed claims and resolving the relevant docket entries.

Dated: New York, New York
      September 10, 2015

                               /s/ Laura Taylor Swain
                              LAURA TAYLOR SWAIN
                              United States District Judge